RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RUBICON REAL ESTATE HOLDINGS, LLC; BROWNE
DESIGN CONSULTANTS, LLC; JOSEPH BROWN,
        *Plaintiffs-Appellants,*

        *v.*

CITY OF PONTIAC, MICHIGAN; GARLAND S. DOYLE,
        *Defendants-Appellees.*

No. 25-1631

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-10439—David M. Lawson, District Judge.

Argued:  June 4, 2026

Decided and Filed:  June 18, 2026

Before:  GRIFFIN, LARSEN, and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Cindy Rhodes Victor, THE VICTOR FIRM, PLLC, Southfield, Michigan, for
Appellants.  Michael T. Berger, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC,
Farmington Hills, Michigan, for Appellees.  **ON BRIEF:**  Cindy Rhodes Victor, THE VICTOR
FIRM, PLLC, Southfield, Michigan, for Appellants.  Michael T. Berger, ROSATI SCHULTZ
JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

    READLER, Circuit Judge.  As our nation celebrates its semiquincentennial, many
Americans have taken the opportunity to reflect on our shared history, both its highs and its lows.

The highs are many, marked by places such as Yorktown, Gettysburg, and Midway, each well deserving of remembrance. But the lows bear contemplating as well for the lessons they teach.

One long running example of the latter has been the challenges presented by a consuming yet unresponsive bureaucratic government. Two hundred and fifty years ago, the American rebels cited King George's repressive government, which sent "hither swarms of Officers to harass our people, and eat out their substance," *The Declaration of Independence* para. 12 (U.S. 1776), as one of many reasons for declaring our independence from England, *id.* paras. 3–29. Although our forthcoming United States government became more responsive to public concern, the ensuing American experiment has not fully solved the weariness of large bureaucracy.

A century ago, those matters were on the mind of our thirtieth president, Calvin Coolidge, as he addressed an audience at the College of William and Mary in colonial Williamsburg on the nation's sesquicentennial. His timeless words—which Silent Cal was famously careful in choosing, *see* Amity Shlaes, *Coolidge* 308–09 (2013)—focused on what drove the American Revolution and the parallel challenges facing the United States in the Roaring Twenties. Of particular concern were his fears of a growing bureaucracy in American government, describing it as the "one element in our institutions that sets up the pretense of having authority over everybody and being responsible to nobody." *See* Calvin Coolidge, *States' Rights and National Unity* (May 15, 1926), https://coolidgefoundation.org/resources/address-at-william-and-mary-college/. For President Coolidge, "[o]f all forms of government, those administered by bureaus are about the least satisfactory to an enlightened and progressive people." *Id.*

Still today, entrenched bureaucracies—from Washington, D.C., to our local communities—maintain their firm grip. That was the reality facing Rubicon Real Estate Holdings, LLC, a Michigan-based real estate developer, who complains of the trials and tribulations it faced in working with the bureaucracy of the City of Pontiac. In 2019, Rubicon began efforts to revive a beleaguered commercial property in the reemerging city with the hope that future tenants could operate several medical marijuana cultivation and processing facilities at the site. Yet that process proved to be easier said than done. Approvals for various zoning

changes lagged.  Licensing for Rubicon's future tenants bounced back and forth between the city clerk's office for a year and a half.  At one point, the city clerk created another bottleneck by pressing an arguably specious argument that the entire project violated the City's medical marijuana ordinances.  Ultimately, the venture fell apart in 2021 when Rubicon's prospective tenants backed out of their commitments.  And following the project's collapse, a separate business owned by Rubicon's managing member, Joseph Brown, lost out on a contract to assist another development project in Pontiac.

Blaming all these misfortunes on the City and its agents, Rubicon, Brown, and Brown's separate business sued the City and the city clerk.  Their complaint alleged a host of civil rights violations arising from the delays in approving the project and the resulting fallout.  Following discovery, however, the district court granted defendants' motion for summary judgment, leaving plaintiffs to seek recourse by way of an appeal.

Rubicon's saga with the City of Pontiac may have fallen short of an experience in good governance.  Yet the undisputed record shows that City officials at worst simply lagged in granting discretionary zoning and licensing approvals to Rubicon and its potential tenants.  As frustrating as those developments surely were for Rubicon, as they are for many others caught in bureaucratic webs, the record here falls well short of clearing the high bar of a constitutional violation.  Accordingly, we affirm.

I.

A.  While federal law continues to prohibit the manufacturing, distribution, dispensing, or possession of marijuana, *see* 21 U.S.C. § 841(a), many states over the past two decades have liberalized their laws to allow for the use of the drug for medical and recreational purposes, *see generally* Joanna R. Lampe, Lisa N. Sacco & Hassan Z. Sheikh, Cong. Rsch. Serv., IF12270, *The Federal Status of Marijuana and the Policy Gap with States* (2026).  That is the case in Michigan.  *See, e.g.*, Seth Quidachay-Swan, *Researching Marijuana Law*, 100 Mich. Bar J. 52, 52 (2021).  Among other developments, Michigan now licenses the farming of marijuana by a "grower," which is a commercial entity that "cultivates, dries, trims, or cures and packages" marijuana for sale to a third party.  *See* Mich. Comp. Laws § 333.27102(g).  Michigan law

likewise recognizes the role a "processor" plays in the distribution scheme—a commercial entity that purchases marijuana from a grower and "extracts resin" from it or creates a marijuana-infused product for resale. *Id.* § 333.27102(v).

Yet even in this post-prohibition era, state and local oversight is not absent. Far from it, in fact. In the Wolverine State, for example, elaborate state and local rules now govern those who wish to engage in the state's burgeoning marijuana business. *See, e.g.*, *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 524–25 (6th Cir. 2023). Consider, for instance, what it takes to start a medical marijuana growing or processing business in the City of Pontiac, a well-known Detroit suburb. First, an entity needs to find a properly zoned site to engage in such activity. But those locations are limited in number. Concerned about the "potential adverse impacts" of medical marijuana facilities on "adjacent property owners," the City has restricted where growing or processing facilities can reside. *See* Pontiac, Mich., Zoning Ordinance, art. 3, ch. 11, § 3.1101 (2025). For starters, any such facility is permitted only in a district zoned for industrial use. *See id.* art. 2, ch. 2 § 2.204; *id.* art. 3, ch. 11, § 3.1109; *see also id.* art. 2, ch. 1, § 2.101 (explaining zoning classifications). From there, the City envisions medical marijuana cultivation and processing occurring primarily within the City's medical marijuana "overlay" districts—discrete geographic areas in Pontiac where medical marijuana businesses would operate. *Id.* art. 3, ch. 11, §§ 3.1102, 3.1108. The City's Planning Commission, however, has the discretion, after considering a number of factors (e.g., the impact on the surrounding neighborhood and public welfare), to approve a "special exception permit" (SEP) for medical marijuana uses outside the overlay district. *Id.* art. 3, ch. 11, §§ 3.1106–3.1107; *id.* art. 6, ch. 3, §§ 6.302–6.303.

Assuming a properly zoned site is found within the City, an entity wishing to engage in medical marijuana growing or processing there must still obtain licenses from both the State and the City before beginning operations. *Id.* art. 3, ch. 11, § 3.1105, Pontiac, Mich., Municipal Code ch. 26, art. XXX, § 26-1498(a)–(b) (2025); Mich. Comp. Laws §§ 333.27501, 333.27502. Each license requires detailed disclosures to the government. *See* Mich. Comp. Laws § 333.27401 (state licensure requirements); Pontiac, Mich., Municipal Code, ch. 26, art. XXX, § 26-1498(c) (City licensure requirements). For instance, the City's application requires information on 31 separate topics, including the grower's or processor's business plans, finances,

proof of insurance, and plans for the property, including how the facility will economically benefit Pontiac. *See* Pontiac, Mich., Municipal Code, ch. 26, art. XXX, § 26-1498(c). Inspections by relevant City departments are likewise required before the final issuance of any permit. *Id.* § 26-1499(b). Ultimately, the city clerk is tasked with assessing any permit application and "shall award a permit to any applicant" who provides a completed application, receives the necessary approvals, and otherwise satisfies the City's many rules for medical marijuana growing and processing facilities. *Id.* § 26-1499(d); *see also* Pontiac, Mich., Zoning Ordinance, art. 2, ch. 5, §§ 2.545–2.546 (listing the rules for medical marijuana growing or processing facilities).

B. Rubicon Real Estate Holdings, LLC, an area real estate developer, had its eyes on a derelict 20-acre parcel of land on Glenwood Avenue in Pontiac. In better days, Glenwood Plaza was the home to storefronts of two former Michigan-based retailers, a K-Mart and Farmer Jack, among other tenants. Hoping to restore Glenwood Plaza to its former glory, Rubicon aimed to develop a shopping area with a grocery store and facilities for medical marijuana growing and processing. So the developer entered into a purchase agreement for the property in March 2019. From there, Rubicon's plan was to have the property rezoned for industrial use, and, once it did, to acquire tenants and have those tenants obtain necessary licenses from the City. As a final step, Rubicon would obtain an SEP for the site, as Glenwood Plaza was located outside of the Pontiac overlay zone.

The plan was launched from solid footing. At the time of purchase, the Glenwood property was zoned for business or residential mixed use. To comply with the City's zoning requirements, the developer applied in July 2019 to rezone the parcel for industrial use. *See* Pontiac, Mich., Zoning Ordinance, art. 2, ch. 2, § 2.204. At a December 2019 hearing, the Pontiac Planning Commission unanimously recommended that the City Council approve Rubicon's application. In turn, the City Council approved the zoning change the next month to "allow [for] medical mari[j]uana facilities to locate" at the Glenwood property. R. 57-11, PageID 785–86. The City and Rubicon also executed a Conditional Rezoning Agreement, which memorialized the zoning change and the parties' mutual understandings for the project. At the same time, City officials reminded Rubicon that permitting requirements were still pending—

specifically, permitting for each tenant operating at Glenwood Plaza, as well as an SEP for the site, given the plaza's location outside the overlay district.

Meanwhile, Rubicon began looking for potential tenants for the Glenwood property. The developer garnered interest from several entities, including Pharmaco, Inc., and Family Rootz, LLC—two state licensed medical marijuana growers and processors. Pharmaco applied for two permits from the City in August 2019 (before the Glenwood property was even zoned for industrial use). Nearly a year later, Garland Doyle, then-interim city clerk, wrote to Pharmaco to inform the company that its applications were deficient on a number of fronts. For instance, Doyle explained, one application neglected to include descriptions of Pharmaco's financial structure; neither included Pharmaco's business plan or its plans to comply with Pontiac sanitation rules. Pharmaco's submissions likewise lacked proof of liability and casualty insurance. Pharmaco supplemented its applications in a timely manner.

In the interim, Pharmaco executed a lease agreement with Rubicon. The agreement contemplated that Pharmaco would need to obtain governmental approval and consents for its operations before it could incur any liability under the lease. The agreement also envisioned the lease commencing once Rubicon provided written notice to its tenant "that has received a certificate of occupancy." R. 57-13, PageID 797.

Around the same time the City identified deficiencies in Pharmaco's applications, Family Rootz applied for permits to operate as a medical marijuana grower and processor at Glenwood Plaza. While Family Rootz contemplated entering into a lease agreement with Rubicon, no agreement was ever executed.

Another six months passed without resolution to either Pharmaco's or Family Rootz's applications. Growing concerned about the delays and prospects for the Glenwood project, Rubicon shifted strategies. Instead of having the SEP application be the last step in the project, the developer opted to move things forward; it applied for a permit in December 2020 to allow any medical marijuana facilities at Glenwood Plaza to operate outside the overlay zone. This effort, however, became a flashpoint between the developer and the City, as evidenced by a pointed letter Rubicon sent to the City Council in early January 2021. The letter's ire was

directed at Doyle and the supposed reasons why he was holding up Pharmaco's and Family Rootz's applications. Rubicon understood Doyle to be claiming that, barring an amendment to the City's ordinances, all medical marijuana growing and processing needed to occur within the City's overlay district, meaning that, without such an amendment, no license could be approved. It pointed to the City ordinance that specifically contemplated medical marijuana uses outside the overlay district upon the approval of an SEP. Maintaining that its lender was refusing to disburse any loan funds for the development until the City issued Pharmaco's and Family Rootz's licenses, Rubicon demanded that the City direct Doyle to issue the licenses immediately.

Doyle, however, was unmoved. On January 29, 2021, he wrote to both Pharmaco and Family Rootz to reject their pending applications, explaining that both entities failed to include information required under the City's ordinances. Notably, Doyle did not reject the applications for failing to comply with Pontiac zoning ordinances, as the site was zoned for industrial use and the applicant was going to "obtain [an SEP] and Site Plan approval from [the] Planning Commission." R. 57-24, PageID 887. Upon receiving Doyle's letter, Pharmaco and Family Rootz timely updated their respective applications.

A number of events in February 2021 further informed Rubicon's development campaign. On February 3, 2021, the Planning Commission allowed for medical marijuana operations outside the City's overlay district and approved Rubicon's SEP, seemingly rejecting Doyle's position. Roughly two weeks later, the City Council met to hear from Rubicon and Doyle over the Glenwood Plaza project. At the meeting, Rubicon reiterated its position articulated in its earlier letter, while Doyle maintained that it would be illegal for the City to license any medical marijuana growing or processing outside the City's overlay district. The City Council, however, took no action following the meeting.

Seemingly having reached its own Rubicon, the developer, along with Family Rootz, forwent further efforts to navigate Pontiac's bureaucracy and instead opted to sue Doyle and the City in Oakland County Circuit Court in late March. The lawsuit sought preliminary injunctive and declaratory relief requiring Doyle to issue the permits for medical marijuana growing and processing, as well as damages. The court initially denied any preliminary relief as it considered

the plaintiffs' other requests.  Meanwhile, Doyle returned to reviewing the Pharmaco and Family Rootz license applications.  On May 21, 2021, the interim clerk again rejected the applications, finding that several previously identified deficiencies had yet to be rectified.  But, the same day, the state court overseeing Rubicon and Family Rootz's lawsuit awarded declaratory relief against Doyle and the City, requiring the "forthwith" "approval of all pending Pharmaco, Inc[.], and Family Rootz applications for grower and processor licenses."  R. 57-34, PageID 996.  (The plaintiffs voluntarily dismissed the rest of the suit in October 2021, as they understood Pontiac to be "issuing permits" in a "timely" manner.)  In the weeks after the court's May order, Doyle issued letters to both applicants indicating that all deficiencies had been rectified, and, in turn, conditionally approving the licenses pending, among other things, City inspections for compliance with local building codes.

Those approvals did not save the project.  Pharmaco terminated its lease agreement with Rubicon on June 18, 2021.  Three months later Family Rootz similarly pulled out of the project.  According to both entities, by the "time the [state court] matter was resolved" on May 21, 2021, the die was already cast, as "it was too late" for either entity to continue with the project.  R. 57-55, PageID 1100; R. 63-10, PageID 1219.  With the exit of these potential tenants, Rubicon's lender refused to disburse any funds and the project collapsed.

Yet Rubicon's saga with Pontiac government was not over.  One of Rubicon's managing members, Joseph Brown, was also the managing member of a separate company called Browne Design Consultants (BDC).  BDC provided design services for developers, including for a developer called SK Properties.  In August 2022, SK's principal met with Pontiac Mayor Tim Greimel, a city councilwoman, and the city planning manager to discuss a potential project.  At the meeting, Greimel allegedly told SK that for the project to proceed the developer needed to sever ties with BDC.  SK thereafter ended its relationship with BDC.

C.  All of this prompted Rubicon, along with Brown and BDC, to return to state court.  Relying on 42 U.S.C. § 1983, plaintiffs sued the City of Pontiac and Doyle.  Rubicon generally claimed that the delays incurred by the project were either so egregious or discriminatory as to violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment as well as

the Fifth Amendment's Takings Clause.  Against the City specifically, Brown and BDC alleged that the City had violated the First Amendment, retaliating against Brown and BDC for Rubicon's earlier state litigation by pressuring SK to end its contract with BDC.  Defendants removed the case to federal court, where discovery proceeded.  Ultimately the City and Doyle moved for summary judgment on all counts, a request the district court granted.  Plaintiffs' timely appeal followed.

## II.

We review the district court's grant of summary judgment to the City and Doyle de novo. *See Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024).  Summary judgment is warranted if, viewing the evidence in the light most favorable to the nonmoving parties, the City and Doyle can show that "there is no genuine issue as to any material fact" and that they are "entitled to judgment as a matter of law." *Chancellor v. Geelhood*, 168 F.4th 388, 394 (6th Cir. 2026) (citation omitted); *see also* Fed. R. Civ. P. 56(a).  If they do so, the burden shifts to plaintiffs to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (emphasis omitted) (citation omitted).  As to this latter stage, "significant probative evidence," as opposed to conjecture or conclusory allegations, are needed by the nonmoving parties. *Walden*, 119 F.4th at 1056–57 (citation modified).  We start with the claims Rubicon lodged against Doyle in his individual capacity before considering the remaining claims against the City.

Doyle contends that the constitutional claims against him fail to overcome his assertion of qualified immunity.  To prove otherwise, Rubicon must make two showings. *See Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024).  One, that Doyle violated the Constitution. *Id.*  And two, that the constitutional right at issue was clearly established at the time of the violation. *Id*. We may consider these questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Like the district court, we focus on the first.

Before delving into Rubicon's specific claims, it is worth pausing to note the somewhat unusual nature of those claims, which focus on Doyle's role as to both the Glenwood site zoning and the applications of Rubicon's potential tenants Pharmaco and Family Rootz to operate

medical marijuana businesses there.  To the extent Rubicon's claims hinge on Doyle's treatment of Pharmaco and Family Rootz, those appear to be legal harms suffered by entities other than Rubicon.  For instance, Rubicon's due process and takings claims concern, at least in part, the delays that resulted in reviewing the potential tenants' applications, whereas Rubicon's equal protection claim focuses on how Pharmaco and Family Rootz were treated differently than other medical marijuana permit seekers.

Rubicon's assertion of a nonparty's constitutional claims raises a few distinct strands of modern standing doctrine.  Start with third party standing—the principle that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Typically, a plaintiff like Rubicon seeking to vindicate the rights of its tenants would need to establish that it has a sufficiently "close relationship with the person who possesses the right" and that "there is a hindrance to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation modified).  At the same time, the third-party standing doctrine is grounded in prudential concerns and does not implicate our jurisdiction under Article III.  *See June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2117–18 (2020)*, abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228  (2022); *id.* at 2139 n.4 (Roberts, C.J., concurring in the judgment).  *But see id.* at 2145 (Thomas, J., dissenting) ("The rule against third-party standing is constitutional, not prudential.").  And prudential standing arguments can be forfeited.  *See United States v. Knipp*, 138 F.4th 429, 433 n.1 (6th Cir. 2025).  *But see Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 n.2 (6th Cir. 2014) (maintaining a court can raise third-party standing sua sponte, but doing so in a context where the plaintiffs also lacked Article III standing).  With defendants declining to make a standing argument here, we can avoid this issue and conclude the City and Doyle forfeited any argument as to third party standing.

Getting past the third-party standing issue does not relieve Rubicon of its obligation to independently establish its own Article III standing to pursue its future tenants' claims.  *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 547 (6th Cir. 2021).  And, as Article III standing is a jurisdictional requirement, we must independently verify its existence.  *See Burt v. Playtika, Ltd.*, 132 F.4th 398, 406 (6th Cir. 2025).  Yet we see little problem with Rubicon's

ability to demonstrate (1) an injury that is (2) attributable to defendants' conduct and (3) redressable by the requested relief. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024). The first and third prongs are plainly satisfied here, as Rubicon has suffered an economic injury from the collapse of the Glenwood project that would be remedied by a damages award. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 462–64 (2017). A slightly harder question is whether Rubicon's economic injury is traceable to any violations of its future tenants' rights. As the Supreme Court has recently reminded us, in cases where a plaintiff is not the "object of a government regulation" traceability depends on how the party that is the object will predictably react to the government action. *See Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025). And, in this setting, we think a "commonsense economic inference[]" is that an unlawful interference with a tenant's license needed to operate a business at its landlord's property will predictably cause "downstream" "economic injuries" to the landlord. *Id.* at 2136–38. Put another way, vindicating the tenants' rights "likely (not certainly, but likely) would make a difference for" Rubicon because, with permits, the tenants "would likely" pay Rubicon rent. *Id.* at 2137. Given all this, we see no need to parse Rubicon's claims based on whose constitutional rights are directly implicated; Rubicon has Article III standing to pursue its claims against Doyle, so we proceed to the merits.

A. *Due Process Claims.* We start with Rubicon's allegation that Doyle violated the Fourteenth Amendment's Due Process Clause. That familiar provision prohibits governmental deprivations of "life, liberty, or property, without due process of law." *See* U.S. CONST. amend. XIV, § 1. While the amendment's text concerns the "process" owed to individuals when suffering such deprivations, the clause has also been construed to protect against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Yet no matter the exact nature of the due process claim, Rubicon must show a deprivation of a constitutional right—here, a property interest. *Green Genie*, 63 F.4th at 526. Specifically, Rubicon asserts that Doyle pushed a frivolous legal argument that medical marijuana growers and processors could never operate outside Pontiac's overlay zone, and thereby delayed the project and deprived the developer and potential tenants of

their interests in having medical marijuana facilities operate at Glenwood Plaza. All of this raises a threshold question of what constitutes "property" under the Fourteenth Amendment.

We know that, to claim a property interest protected by the Fourteenth Amendment, a plaintiff needs more than an "abstract need or desire" or "unilateral expectation" of some property right. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). There is likewise no protected entitlement in an interest that "government officials may grant or deny . . . in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *see, e.g.*, *Med Corp. v. City of Lima*, 296 F.3d 404, 411 (6th Cir. 2002) (no property interest because city code failed to provide an "explicit guarantee" as to the benefit awarded). Rather, a property interest requires "a legitimate claim of entitlement," one that "stem[s] from an independent source such as state law." *Roth*, 408 U.S. at 577.

Here, neither Rubicon nor its potential tenants possessed a "legitimate claim of entitlement" in using the Glenwood site for medical marijuana cultivation or processing prior to when its injuries were inflicted in May 2021. Pontiac does not award zoning and permitting allowances for medical marijuana businesses as a matter of right. Quite the opposite. Pontiac's regime requires a number of regulatory hoops before a medical marijuana business can operate in the City, with each step in the process contingent on the subjective judgment of City officials on whether to award a zoning change or a license. *See* Pontiac, Mich., Zoning Ordinance, art. 2, ch. 2, § 2.204; *id.* art. 6, ch. 8, § 6.802 (general zoning changes); *id.* art. 3, ch. 11, § 3.1106–3.1107, art. 6, ch. 3, § 6.302–6.303 (SEPs); Pontiac, Mich., Municipal Code, ch. 26, art. XXX, § 26-1498 (licensing). For instance, in reviewing an SEP application to operate outside the overlay district, City officials consider the project's "impact" on surrounding neighborhoods and its effect on the "public welfare of the community." *See* Pontiac, Mich., Zoning Ordinance, art. 3, ch. 11, § 3.1107(A), (E). Likewise, securing a license to operate a medical marijuana business depends on the city clerk's assessment of the applicant's compliance with 31 different requirements, from whether the applicant adequately describes the economic benefits of the facility to the City to whether the applicant's plans to cultivate marijuana comport with City rules. Pontiac, Mich., Municipal Code, ch. 26, art. XXX, § 26-1498. Far from providing an "explicit guarantee" to operate a medical marijuana business in Pontiac, *see Med Corp.*, 296 F.3d at 411, the City's

ordinances go so far as to disclaim any individual right or entitlement in a permit, Pontiac, Mich., Municipal Code, ch. 26, art. XXX, § 26-1499(i).  Given the breadth of what City officials were allowed to consider and the capacious metrics by which they could gauge a zoning or a permit request, "[i]t is difficult to imagine a more flexible standard."  *See Biser v. Town of Bel Air*, 991 F.2d 100, 104 (4th Cir. 1993) (Wilkinson, J.) (assessing rules requiring consideration of a requested zoning exception's impact on the town's "general welfare" in light of "eighteen separate factors"); *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992) (rejecting notion that plaintiff was entitled to a zoning change when such a change was made contingent on subjective findings about the desirability of the proposed use).  Because City officials "retain[ed] discretion" in allowing medical marijuana facilities to operate at Glenwood Plaza, neither Rubicon nor its tenants had any cognizable interest in obtaining such benefits from the City.  *See Williams v. City of Detroit*, 54 F.4th 895, 899 (6th Cir. 2022).

Rubicon responds that when the City Council approved a resolution to rezone the Glenwood property to industrial use and executed the Conditional Rezoning Agreement memorializing the zoning change, the developer's interests in using the property for medical marijuana purposes evolved into an entitlement.  True, once a discretionary zoning change has been conferred, a property interest may sometimes exist.  *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856 (6th Cir. 2012).  But where a property owner can only demonstrate that it satisfied "certain minimum, mandatory" thresholds needed for land use approval, with further authorizations tied to a city officials' discretion still pending, no property interest exists.  *See Silver*, 966 F.2d at 1036.  That latter rule aptly describes this case.  The January 2020 zoning change was isolated to rezoning the Glenwood site to allow for industrial use.  Many steps remained to secure authorization to operate medical marijuana businesses at Glenwood Plaza.  Nothing in the zoning change or the Conditional Rezoning Agreement purported to eliminate those remaining steps.  Instead, the agreement envisioned Rubicon continuing to pursue the "necessary permits" for the project.  R. 57-10, PageID 772–73.  Confirming as much, City officials, in informing Rubicon about the approval of its initial zoning change, reminded the developer that medical marijuana permits for each facility operating at Glenwood as well as an SEP for the site were still needed.  So even with the initial rezoning hurdle out of the way,

Rubicon's right to develop the property for medical marijuana business purposes remained at the discretion of the City. Stated another way, the hopes that marijuana businesses would eventually operate at Glenwood Plaza were just that—entirely aspirational and contingent on further discretionary decisions by the City—leaving the developer well short of a property interest cognizable under the Due Process Clause. *See Silver*, 966 F.2d at 1036; *Lifestyle Cmtys., Ltd. v. City of Worthington*, 165 F.4th 1013, 1027 (6th Cir. 2026); *cf. Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1332 (Fed. Cir. 2012) ("[R]elying on representations by [the government] in the hope that the government will grant a discretionary [benefit] does not create a compensable property interest.").

Yet, says Rubicon, a broader interest is at stake—namely, that defendants deprived the developer of its property interest in its ownership of Glenwood Plaza, for which it had expectations of obtaining rental income from its potential tenants. These generalized interests, however, do not fit the governing legal framework. Take Rubicon's base interest in the property itself. In cases where a plaintiff alleges a due process violation stemming from a thwarted attempt to obtain governmental approval for a particular use for real property, we have long rejected the argument that the "only property interest requirement" necessary to demonstrate a protected entitlement "is ownership of land." *Triomphe Invs. v. City of Northwood*, 49 F.3d 198, 201 (6th Cir. 1995). Instead, we ask a more specific question: whether the plaintiff had a legitimate claim of entitlement in the underlying governmental benefit. *Id.*; *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 573 (6th Cir. 2008) ("[T]o establish a property right in a future, rezoned land use, an individual must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to rescind the benefit." (citation modified)); *see, e.g.*, *Silver*, 966 F.2d at 1036 (describing the plaintiff's "property interest" in the "use of the undeveloped parcel as a condominium complex" and then applying the *Roth* entitlement test). Any other approach would nullify the legions of cases that analyze zoning or permitting challenges under the *Roth* entitlement test. After all, if property ownership alone is sufficient to trigger the due process inquiry, there would be no need to fuss with any purported property interest in the underlying zoning change or permit. Instead, we would skip straight to the question of whether there has been a deprivation. But that will not do.

As we have explained, Rubicon's interest in the underlying activities its tenants sought to undertake—and the rent and income generated from those activities—rested on discretionary government approvals.  *See EJS Props., LLC*, 698 F.3d at 858.  Accordingly, Rubicon's due process claims necessarily fail.

B.  *Takings Claim*.  With Rubicon's due process claims resolved, we turn to its related takings claim against Doyle.  The crux of Rubicon's argument is that Doyle "claim[ed] that the zoning ordinance did not permit medical marijuana facilities on the Glenwood Property" and thereby delayed the City's zoning and permitting approvals and "effectively destroyed Rubicon's entire developmental project," amounting to a compensable taking.  Appellants' Br. at 24, 26.  Rubicon's claim brings into view the Takings Clause of the Fifth Amendment, which, as applied to the states through the Fourteenth Amendment, prohibits the government from taking "private property" for "public use, without just compensation."  *Novak v. Federspiel*, 140 F.4th 815, 820 (6th Cir. 2025) (per curiam) (first quoting U.S. CONST. amend. V; and then citing *Sheetz v. County of El Dorado*, 144 S. Ct. 893, 899 (2024)).  A takings claim necessarily requires proof of a cognizable property interest as well as a government taking of that interest without just compensation.  *See Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016).

1.  *Property Interest*.  The property interest required to support a takings claim differs from that required for a due process claim.  Even so, Rubicon's mere interest in owning the Glenwood site does not "automatically establish[] the property interest needed to pursue its takings claim."  *See Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021).  In some cases, assessing a claimed property interest may turn on a "searching inquiry" into "background principles" of state law and the "nature of the land use proscribed" to "determine whether the plaintiff actually held the property interest that [it] claim[s] to have been taken."  *Id*. (citations omitted).  As neither party's briefing attempted to aid us in that inquiry, we will assume for today's purposes that, as to the takings claim, Rubicon has a sufficient property interest through its ownership of Glenwood Plaza.  Doing so allows us to proceed to address whether any delay created by Doyle amounted to a taking.  *See Lifestyle Cmtys., Ltd*., 165 F.4th at 1022.

2.a. *Taking*. Answering that question requires examining what a taking entails. Given the recognized "bundle" of legal rights that stem from property ownership (e.g., the right to possess, use, exclude others from, and dispose of the property), a taking can come in different forms. *Knight v. Metro. Gov't of Nash. & Davidson Cnty.*, 67 F.4th 816, 822 (6th Cir. 2023). Most varieties are not at issue here, so we need not address them.

The chief theory Rubicon advances is that, even if the City's zoning and licensing rules are permissible, the delay that Doyle injected into the proceedings amounted to a regulatory taking. When, then, does a government's delay in issuing a permit or zoning change amount to a taking? Seldom, if ever. Built into the "incidents of [property] ownership" is the understanding that "governmental decisionmaking" takes time, meaning that delays in obtaining approval before a property can be altered ordinarily does not amount to a taking. *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980), *abrogated on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). Recognizing the understandable frustration with all-too-often belabored government process, this rule nonetheless makes sense. Requiring compensation "for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 335 (2002). Nor should federal courts serve as a regular timekeeper over local governmental approval processes. *Cf. Lingle*, 544 U.S. at 538; *Norton v. Village of Corrales*, 103 F.3d 928, 933 (10th Cir. 1996) ("Federal courts should be reluctant to interfere" with local land use decisions, as we "do not sit as a zoning board of appeals." (citation modified)).

With these understandings in mind, for governmental delay to amount to a taking, the lag must be "extraordinary." *Agins*, 447 U.S. at 263 n.9. In making that assessment, we consider the length of the delay, any bad faith on the part of the government, and any delay that Rubicon caused. *See Richmond Rd. Partners, LLC v. City of Warrensville Heights*, No. 24-3502, 2025 WL 737342, at *3 (6th Cir. Mar. 7, 2025).

No extraordinary delay occurred here. Recall that Rubicon's claim turns on Doyle purportedly throwing sand in the gears of the Glenwood project by maintaining (at least for a

time) that medical marijuana facilities could not exist outside of the City's overlay district. *See* Appellants' Br. at 24. While the record is not entirely clear as to when Doyle began pressing the point, he seems to have first articulated his concerns in late 2020 or early January 2021. It is also unclear as to when he relented. He seemed to have relented a few weeks later, on January 29, 2021, when he declined to reject any pending licenses on zoning grounds and suggested that Rubicon just needed to apply for an SEP. Yet he re-raised his concerns at the City Council meeting on February 16. Regardless, Doyle's position apparently did not have much sway on the Planning Commission, as it granted Rubicon's SEP, which allowed for medical marijuana operations outside the overlay district. We likewise lack evidence that Doyle pressed the zoning argument in any other way that slowed the project. Instead, he seems to have focused on other concerns with the permitting applications before providing approvals in May and June 2021.

In the end, Doyle's "refus[al] to recognize" that medical marijuana operations could occur outside the overlay zone at most delayed the project a couple of months. Appellants' Br. at 24. That is far from an "extraordinary" delay—courts have "condoned" far longer ones. *Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (citing examples of "approximately eight years," "forty months," and "sixteen months" as not constituting a taking); *Richmond Rd. Partners, LLC*, 2025 WL 737342, at *4 (recognizing that "[i]n the bureaucratic world" a delay of one year is not extraordinary). Delay was plainly expected, as the City took six months to approve its initial zoning change to allow for industrial use at Glenwood Plaza, a delay over which Rubicon voices no concerns. Doyle's understanding of the City's ordinances, we recognize, may not have been entirely sound. But nothing suggests that Doyle's actions were done in bad faith. *Cf. U.S. ex rel. Wall v. Circle C Constr., LLC*, 868 F.3d 466, 471 (6th Cir. 2017) (recognizing bad faith to exclude a "honest mistake as to one's rights or duties" and to instead require some "interested or sinister motive" (citation modified)). Finally, as the district court recognized, many of the delays in the licensing and permitting process were due either to Rubicon dragging its feet in applying for the SEP or to various admitted deficiencies in Rubicon's future tenants' license applications. *See* R. 69, PageID 1321–22. All told, the delay here is about what one might expect in dealing with local government bureaucracy and is far from an actionable deprivation under the Takings Clause.

b.   Rubicon views the delay as far longer and far more problematic.  To that end, it emphasizes that Doyle received Pharmaco's applications in August 2019 yet did not approve them until June 2021, nearly two years later.  Rubicon's position falls short on a few fronts, beginning with the fact that, as already explained, even a 22-month delay pales in comparison to anything close to what courts have deemed to be extraordinary.  *See Wyatt*, 271 F.3d at 1098.

Rubicon's portrayal of the record is similarly lacking.  The developer presents no evidence that the various deficiencies identified in either of its tenants' applications were unjustified or could have been ignored by Doyle.  In any event, Rubicon's takings claim was never premised in district court (nor here) on Doyle dawdling during his 2019 review of the permitting applications.  Instead, Rubicon's argument was that Doyle began slow walking the permitting and zoning on account of his understanding of the overlay district rules, a view he seemingly first pressed in late 2020.  Rubicon may not bootstrap to its claim unrelated delays for which Doyle cannot be blamed.

Shifting gears, Rubicon turns its attention to the sizable proposed investment in Glenwood Plaza, maintaining that "regardless of length," the economic effects of the delay—the asserted elimination of all value in the property—are sufficiently sizeable to amount to a taking.  Appellants' Br. at 26.  The record, however, does not support that claim.  For example, no evidence shows the Glenwood site is now worthless or cannot be developed for other purposes.  Nor is there evidence that Doyle's temporary advocacy of a strict understanding of the overlay zone for a few months is what led to the project's collapse.  The tenants' affidavits attest that the process as a whole simply dragged on to the point that by May 2021, it was just "too late" to continue with the project.  R. 57-55, PageID 1100; R. 63-10, PageID 1219.  Either way, any investment-backed expectations Rubicon had in the property needed to be "reasonable" in relation to its regulatory taking theory.  *See Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 684–85 (6th Cir. 2004).  In other words, Rubicon had to expect the few months of delay as the City appropriately resolved the various complex zoning and permitting questions surrounding a multi-million dollar development.

Nor is it extraordinary that Rubicon had to resort to state court litigation to get Doyle to move on the applications. While we typically expect public officials to carry out their duties without a court ordering as much, we generally reject the notion that delays created by state court litigation amount to a taking, as "the time necessary for review, including judicial review," is simply a normal delay in the world of government. *Richmond Rd. Partners, LLC*, 2025 WL 737342, at *3 (citing Edward H. Ziegler, Jr., First English *and normal delays—Illegal permit denial and temporary takings*, 1 Rathkopf's The Law of Zoning and Planning § 6:28 (4th ed.)).

We do not discount the prospect that significant and long-term delays of a project caused by government foot dragging could amount to a taking. *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 356 (Thomas, J., dissenting) (maintaining that a "temporary restriction" that prohibited all land use for half a decade can function akin to a *Lucas* taking because "[i]n the long run we are all dead" (quoting J. Keynes, *Monetary Reform* 88 (1924))). That said, today's case does not nearly approach that situation. For better or worse, an "incident[] of ownership" in pursuing an ambitious development in a "bureaucratic world" is the expectation that the project will not occur overnight and will need sufficient review by public officials. *See Agins*, 447 U.S. at 263 n.9; *Richmond Rd. Partners, LLC*, 2025 WL 737342, at *4. Here, no taking resulted from the relatively short delays created by Doyle.

C. *Equal Protection Claim*. Rubicon's remaining claim against Doyle maintains that the interim clerk violated the Equal Protection Clause of the Fourteenth Amendment. Rubicon presses a class-of-one theory. To prevail, the developer must show that (1) Doyle "intentionally treated" either Rubicon or its potential tenants "differently from others similarly situated"; and (2) "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). At the outset, all agree that Rubicon lacks any direct evidence that Doyle engaged in intentional discrimination. That leaves Rubicon to maintain that circumstantial evidence exists from which a jury could infer that Doyle's conduct was driven by intentional irrationality toward those involved with the Glenwood development. In this setting, it bears noting, we require circumstantial evidence beyond mere differential treatment between a plaintiff and a comparator; were the rule otherwise, any erroneous, unequal application of the law could be the basis for a class of one claim. *See Green Genie*, 63 F.4th at 527–28. That

leaves Rubicon to show that any adverse treatment by Doyle was a "stark outlier from an otherwise consistent pattern of favorable treatment in similarly situated cases." *Id.* at 528 (quoting *SECSYS, LLC v. Vigil*, 666 F.3d 678, 689 (10th Cir. 2012) (Gorsuch, J.)). So Rubicon's steep hurdle at step one of an *Olech* claim requires significant evidence of relevant comparators whose treatment by Doyle was unambiguously different than those involved with the Glenwood development. *Id.*

How does Rubicon fare on this front? Much of its briefing before both the district court and this Court merely rehashes similar complaints to those undergirding its due process and takings claims. In particular, Rubicon protests Doyle's understanding of the overlay district rules and complains that Pharmaco's and Family Rootz's permits lingered for years before approval. Largely absent from Rubicon's submissions, however, is any evidence of relevant comparators. *See Andrews*, 11 F.4th at 481 (Larsen, J., concurring in part and dissenting in part) (observing that the "similarly situated" requirement must go beyond establishing the plaintiff's "side of the equation" and instead "[w]e must also know something about" the comparators). For instance, there is nothing in the record showing that Doyle treated Rubicon differently than another developer similarly seeking to establish a medical marijuana commercial venture outside the City's overlay district. *See Loesel v. City of Frankenmuth*, 692 F.3d 452, 462–63 (6th Cir. 2012) (requiring an assessment of "relevant similarity" by looking at the "facts and context of the case" (citation modified)); *see also Anders v. Cuevas*, 984 F.3d 1166, 1180 (6th Cir. 2021) (similar). And there is scant evidence of any relevant comparators to Pharmaco or Family Rootz, such as a medical marijuana business that obtained a permit in a far faster timeframe than those entities seeking to operate at Glenwood Plaza. Rubicon's only evidence that even references a potential comparator is what *Doyle* provided at summary judgment. And that evidence—letters Doyle sent to other permit seekers *rejecting* their applications for deficiencies similar to those in Pharmaco's or Family Rootz's applications—understandably will not suffice. Those items, after all, do not show any similarly situated entity that received favorable treatment from the City relative to Rubicon's potential tenants. *See Green Genie*, 63 F.4th at 528.

Rubicon disagrees. To begin, it faults Doyle and the City for not producing comparator evidence, for example, other businesses that had to wait as long as Pharmaco did to obtain its

license.  But in many respects, Rubicon's criticism gets things backwards, both procedurally and substantively.  As a matter of procedure, consider the dynamics at the Rule 56 stage.  There, Doyle had the initial burden to show that there was no dispute of material fact.  Doyle did so.  He maintained that "there is no evidence that Family Rootz or Pharmaco were treated differently than any other applicant, much less that Rubicon was treated differently than any other property owner attempting to lease property to a marijuana business."  *See* R. 57, PageID 613; *see also Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024) (observing that the initial burden of production at summary judgment is "little more than a formality" and that "a movant need only assert the lack of any genuine disputes of material fact in the record" (citation modified)).  At that point, the burden shifted to Rubicon to provide "significant probative evidence" such as evidence of disparate treatment of a comparator showing the need for trial.  *Walden*, 119 F.4th at 1056–57 (citation modified).  On that metric, Rubicon came up short.

And then consider substance.  We generally presume that state actors properly discharge their official duties, meaning we assume that if Doyle subjected Rubicon and its potential tenants to lengthy delays, he did the same for similarly situated entities.  *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997).  To overcome the presumption of regularity, Rubicon (not Doyle) needed to present "clear evidence to the contrary," which it failed to do.  *Id.*

Having properly framed the summary judgment inquiry, we agree with the district court that Rubicon failed to carry its burden.  Focusing on the letters Doyle sent to other permit seekers, Rubicon complains that others were allowed more time to repair deficiencies in their applications than was Pharmaco.  This attempt to manufacture disparate treatment is too clever by half, as it is a reversal from the central thesis of Rubicon's equal protection claim.  Instead of complaining that Doyle slow walked the Glenwood permits relative to other permit seekers, Rubicon now complains that Doyle expedited review of Pharmaco's application.  Nor, we note, has Rubicon established that the entities at issue are relevant comparators to Pharmaco, such that any differences in timing could only be due to irrationality on Doyle's part.  *See EJS Props., LLC*, 698 F.3d at 866 ("Gaps in time and context may suggest a change in policy rather than differential treatment." (citation modified)).  And, like the district court, we fail to see how Pharmaco was injured by the disparate treatment, in that all agree it complied with the shorter

deadline. *See* R. 69, PageID 1308. In any event, even if there was a discrepancy between the time Doyle provided to Pharmaco relative to another similarly situated medical marijuana business seeker, Doyle's treatment of Pharmaco was not the kind of "stark outlier" required to show intentional discrimination. *See Green Genie*, 63 F.4th at 528. Meanwhile, the record shows that Family Rootz received a more generous deficiency response period. All told, Rubicon has provided no evidence of intentional discrimination, so we affirm the dismissal of the equal protection claim against Doyle.

III.

Having affirmed the dismissal of the claims lodged against Doyle, we turn to the claims against the remaining defendant, the City of Pontiac. Seeking to hold a municipality liable under 42 U.S.C. § 1983 raises distinct issues. A municipality is a "person" under § 1983 that can be held liable for its *own* illegal acts, such as when a governmental body has a policy or custom that "itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989). But a municipality cannot be held liable simply because one of its employees has violated the Constitution. *See Monell*, 436 U.S. at 694. Instead, the party must connect the employee's conduct to a municipal policy or custom. *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022). A plaintiff has four discrete avenues for proving the municipal policy or custom requirement: (1) a legislative enactment or policy; (2) an action taken by an official with final decisionmaking authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). For any chosen path, a plaintiff must then satisfy § 1983's "rigorous" causation standard—it must show that it was the municipality's unconstitutional policy or custom (and not just the employee's action) that caused the plaintiff's injury. *See Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997)). Otherwise, no liability can flow to the municipality. *See Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020). These principles resolve the remaining claims on appeal.

A.  *Rubicon's Claims Against the City*.  First up are the due process, takings, and equal protection claims lodged against the City.  Critical here is the fact that all three claims stem from Doyle's conduct, not an independent Pontiac policy or custom.  Indeed, Rubicon's theory is that Doyle expressly ignored the City's zoning policies in violating the developer's rights.  So with no underlying constitutional violation by Doyle, these claims cannot proceed against the City. *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021).

B.  *Brown and BDC's Claim Against the City*.  All that remains is the First Amendment retaliation claim lodged by Brown and BDC against the City.  To prevail on their free speech retaliation claim, Brown and BDC must show that they (1) engaged in constitutionally protected speech; (2) an adverse action was taken against them; and (3) a causal connection exists between the speech and the adverse action.  *See Lemaster v. Lawrence County*, 65 F.4th 302, 307 (6th Cir. 2023).  Brown and BDC's theory addresses those elements as follows.  One, that Brown (through his company Rubicon) engaged in constitutionally protected speech by engaging in litigation in state court in 2021 over the Glenwood development.  Two, that Brown and BDC suffered an adverse action when Pontiac's mayor, Tim Greimel, more than a year later, successfully encouraged another developer (SK) to cancel its contract with BDC at the risk of not obtaining zoning approval for a project.  And three, that Greimel's request emanated from his lingering bitterness from the Rubicon lawsuit.  Brown and BDC add that the City is on the hook for Greimel's retaliation because his conduct amounted to a policy that the City "adopted."  R. 63, PageID 1153.  To our mind, there are deep flaws in both the merits and *Monell* arguments.  But we need not address the merits, for the City cannot be held liable.

Assuming, without deciding, that Brown and BDC can survive summary judgment on their retaliation claim, they still must link the constitutional violation to a City policy or custom. *See Gambrel*, 25 F.4th at 408.  An employee's "single unconstitutional act" may do the trick if it was "taken by an authorized decisionmaker" of the municipality, meaning that individual had ultimate authority to establish the underlying policy or custom with respect to the subject matter in question.  *See Bible Believers v. Wayne County*, 805 F.3d 228, 260 (6th Cir. 2015) (en banc) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 483 (1986)).  All seem to agree that the underlying policy at issue was conditioning a zoning change approval upon the act of the

applicant (here, SK firing BDC). But the Pontiac mayor lacks any final authority over the rezoning process; the seven-member City Council approves or rejects zoning requests. *See* Pontiac, Mich., Zoning Ordinance, art. 6, ch. 8, § 6.802(D); Pontiac, Mich., Home Rule Charter, art. III, § 3.101. And while the mayor has veto authority over most actions of the City Council, *see* Pontiac, Mich., Home Rule Charter, art. III, § 3.112(g), the City Council can override that veto, *id.*, meaning the veto does not imbue the actor with final decisionmaking authority for purposes of *Monell, see Flagg v. City of Detroit*, 715 F.3d 165, 174–75 (6th Cir. 2013) (holding that an official has "final authority" only if his decisions are "final and unreviewable and are not constrained by the official policies of superior officials" (citation modified)); *see, e.g.*, *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (holding that mayor was not the ultimate policymaker with respect to zoning decisions where the city charter provided that the council could override mayor's veto of zoning ordinances). Lacking any evidence that the City Council ever approved of Greimel's action—at most, only one of the seven council members was even aware of the mayor's comments—Brown and BDC simply cannot show a connection between the City and any unconstitutional act by Greimel.

Brown and BDC do not engage on the limits of the mayor's power. Instead, they argue that regardless of whether Greimel was a final decision maker, liability can be imputed to the municipality under a cat's paw theory. That theory, more commonly invoked in employment discrimination cases, allows the illicit "animus" of an individual who influenced the decisionmaker in certain cases to be imputed to the employer. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415–16 (2011). Think of a biased subordinate who intentionally manipulates a clueless boss into taking an adverse action against an employee. *See Marshall v. The Rawlings Co.*, 854 F.3d 368, 380 (6th Cir. 2017). But there is no evidence here that Greimel influenced any final decisionmaker to take an adverse action against Brown or BDC. The mayor's 2022 conversation pressing SK to fire BDC is the extent of the allegation, one that does not involve the City Council. Nor should we extend the cat's paw theory into the land of *Monell*. The concept of a municipality, through no fault of its own, being held liable for the single act of its agents sounds a lot like respondeat superior, which *Monell* expressly forecloses. *See Jones v. City of Hutto*, 154 F.4th 332, 342 (5th Cir. 2025) ("[T]he cat's paw claim is based in agency

principles, so it is incompatible with *Monell*'s bar on *respondeat superior* and unavailable to Jones."); *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) (similar). Likewise, the causation rules for *Monell* require proof that the municipality, through its "deliberate conduct," was the "moving force behind the injury alleged." *See Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038 (6th Cir. 2024) (citation modified). Obliviousness by the boss will not do. To the extent Brown contends the City Council simply acquiesced in Greimel's conduct, the rule remains that a final decisionmaker's "after-the-fact approval" of a single constitutional violation by a subordinate is insufficient to establish a *Monell* claim. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013). Which makes sense. With a one-time violation, the employee causes the underlying harm and the municipality at most gets involved after the fact. *Id.* (recognizing an alternative rule would "effectively make" the municipality "liable on the basis of *respondeat superior*"); *see also Pineda*, 977 F.3d at 495 (observing that a municipality can ratify the conduct of one of its employees only after a pattern of failing to act in response to several prior incidents of the alleged rights violation).

As a last gasp, Brown and BDC argue that the City forfeited any argument that the mayor was not a decisionmaker by saving it until its reply brief in district court. But Brown and BDC, in opposing summary judgment, maintained that a final decisionmaker "adopted" the mayor's action, raising the question of who the decisionmaker was as to the underlying zoning decision. R. 63, PageID 1153. Said another way, it was fair game for the City to reply to arguments made in Brown and BDC's response brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). At all events, the burden remains with Brown and BDC to demonstrate *Monell* liability, whether it be through proving the mayor was a final decisionmaker or some other avenue. *See Burgess*, 735 F.3d at 478. That the City waited until its reply brief to challenge the exact avenue plaintiffs were using to establish *Monell* liability does not relieve Brown and BDC of having to prove a basic element of their claim at summary judgment. *See United States v. 15 Bosworth St.*, 236 F.3d 50, 55 (1st Cir. 2001) ("[I]t is a bedrock rule that when there is insufficient evidence on a particular issue, that issue must be resolved against the party who bears the burden of proof." (emphasis omitted)). With no record support satisfying Brown and

BDC's burden on the merits or *Monell*, the district court did not err in dismissing the final claim in this suit.

\*        \*        \*        \*        \*

We affirm the judgment of the district court.